2025 IL App (2d) 240357-U
No. 2-24-0357
Order filed January 16, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BONNIE NEUBAUER and RICHARD NEUBAUER, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 22-LA-76 |
| RODNEY H. PIERCY and PIERCY & ASSOCIATES, LTD., | ) ) ) | Honorable Kevin G. Costello, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Summary judgment for defendants was proper where plaintiffs' action for breach of fiduciary duty was brought beyond the limitations period, in that plaintiffs knew or should have known more than two years before they filed suit that defendants had injured them wrongfully. (2) Plaintiffs' equitable estoppel claim failed because it was based on the same conduct as their cause of action against defendants and that conduct did not prevent them from filing their claim within the two-year limitations period.

¶ 2    Plaintiffs, Bonnie Neubauer and Richard Neubauer, filed a two-count second amended complaint against defendants, Rodney H. Piercy (Rodney) and Piercy & Associates, Ltd. (P&A), alleging that (1) Rodney breached his fiduciary duties to plaintiffs (count I) and (2) P&A was

liable, under the doctrine of *respondeat superior*, for the breaches of fiduciary duty and negligence of its agent, Rodney (count II). The trial court granted defendants' motion for summary judgment, holding that the two-year statute of limitations (see 735 ILCS 5/13-214.3(b) (West 2022)) barred the action. The court also rejected plaintiffs' argument, raised for the first time at the motion hearing, that defendants should be estopped, based on Rodney's conduct, from raising the statute of limitations as a defense. Plaintiffs timely appeal, contending that the court erred (1) in determining as a matter of law that plaintiffs knew or should have known more than two years before filing suit that they were wrongfully injured and (2) by failing to find that Rodney's conduct estopped defendants from asserting the statute of limitations as a defense. We affirm.

¶ 3                    I. BACKGROUND

¶ 4     Plaintiffs filed their initial complaint on March 14, 2022. They later filed an amended complaint and, on December 18, 2023, a second amended complaint. The second amended complaint, at issue here, generally alleged as follows.

¶ 5     Rodney was the founding partner of P&A, a law firm that specialized in estate planning services, including tax elimination and wealth protection strategies. In 2014, Rodney and his son, Matthew Piercy (Matthew), founded Family Wealth Legacy (FWL), an investment firm. Matthew was also employed at P&A as a " 'Legacy Strategist.' " In this role, Matthew "solicited investors to purchase investments that purported to minimize taxes and promote safe, fixed returns unaffected by the cycles of the stock market." However, according to the second amended complaint, these investments were "risky, unstable, and illiquid." In September 2016, Matthew left P&A and moved to California, but he continued to manage investments for P&A clients. Rodney was the majority owner of FWL until February 2017, when he assigned his ownership interest to Matthew.

¶ 6 In July 2018, Matthew confessed to Rodney that he had misrepresented to investors how he managed their money. Matthew admitted that he had " 'lost' " $21 million that he had gathered from investors. Matthew asked for Rodney's help with his plan to recover the money, which involved selling the "algorithmic application" used by investors. Matthew also told Rodney that he was the subject of a criminal grand jury investigation led by the United States Attorney for the Eastern District of California. Rodney agreed to help Matthew and to act as legal liaison to Matthew's criminal defense counsel. By the end of August 2018, Rodney concluded that the misappropriated monies would not be recovered through the sale of the algorithmic application.

¶ 7 In October 2018, plaintiffs were introduced to Matthew by Grant Birkley, a broker with SagePoint Financial. Plaintiffs spoke with Birkley and Matthew on the phone about investing in an FWL investment managed by Matthew. On November 17, 2018, plaintiffs transferred approximately $1.4 million from a SagePoint account to Matthew to purchase a certain FWL investment.

¶ 8 In December 2018, at Birkley's recommendation, plaintiffs retained Rodney and P&A to amend their trust agreement. During a December 2018 meeting with Rodney, plaintiffs discussed their assets and specifically mentioned the monies invested with FWL under Matthew's management. Plaintiffs provided Rodney with a December 1, 2018, FWL statement. Plaintiffs were aware that Matthew was Rodney's son. Rodney completed the amended trust agreement.

¶ 9 The second amended complaint alleged:

"Beginning in January 2020, [plaintiffs] began to question Matthew about the status of their account. They had not received statement [*sic*] for several months, and Matthew's explanation for the untimely statements began to concern them. In early 2020[,] [plaintiffs] demanded the liquidation of their FWL account and the return of the monies they entrusted

to Matthew and FWL. In March 2020, after [plaintiffs] received a grand jury subpoena requesting documents concerning Matthew, FWL[,] and communications they received from Matthew, their efforts to recover their investments increased but with no success."

¶ 10     On November 11, 2020, a federal grand jury indicted Matthew on 29 counts, which alleged that, " '[b]eginning in or about July 2015 and continuing until at least August 2020[,] Matthew *** knowingly participated in a scheme to defraud investors[.]' " According to the second amended complaint, Matthew was in federal prison awaiting trial.

¶ 11     Count I of the second amended complaint alleged that Rodney owed plaintiffs the duties of fidelity, honesty, and good faith, which he breached when he failed to disclose to plaintiffs, among other things, (1) any conflict of interest he may have had and (2) information about Matthew, namely his confession that he made misrepresentations to FWL investors, lost $21 million in invested funds, and was under federal investigation for securities fraud. Plaintiffs further alleged that Rodney breached his duties by failing to advise them that they had a claim for rescission under the "Illinois Securities Law" (ISL) to recover the monies that Matthew had fraudulently solicited from them and that they had only six months to file that claim. According to plaintiffs, had Rodney advised them that they had a claim under the ISL, they would have been able to recover their money. Count II alleged that P&A was liable, under a theory of *respondeat superior*, for the breaches of fiduciary duties and negligence of its agent, Rodney. The complaint sought "compensatory damages," "lost opportunity," "interest for more than $1,500,000 together with taxable costs and disbursements," "damages recoverable under the [ISL]," and "the return of legal fees paid to [P&A]."

¶ 12     On January 11, 2024, defendants filed an amended answer and various affirmative defenses, including that the complaint was barred by the two-year statute of limitations set forth

in section 13-214.3(b) of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13-214.3(b) (West 2022)), which provides that a plaintiff filing an action against an attorney must file suit within two years of when the plaintiff "knew or reasonably should have known of the injury for which damages are sought." According to defendants, plaintiffs "knew of their injury before March 14, 2020," *i.e.*, more than two years before the initial complaint was filed on March 14, 2022, and thus, their second amended complaint was barred.

¶ 13     On February 20, 2024, defendants filed their motion for summary judgment (*id.* § 2-1005) with a supporting "Statement of Material Facts" (fact statement) derived from Richard's testimony at his discovery deposition on March 7, 2023, and November 1, 2023. Defendants contended that the second amended complaint was time-barred under section 13-214.3(b) of the Code.

¶ 14     According to the fact statement, Birkley first mentioned Matthew to plaintiffs in 2016. In 2018, plaintiffs, Birkley, and Matthew had several phone conversations about investment options with Matthew. Ultimately, in November 2018, plaintiffs transferred $1,434,792.38 from their SagePoint account to Matthew for investing on their behalf. Matthew used a company called Midland as a reporting vehicle to track invested funds. Midland issued quarterly statements to plaintiffs, while FWL issued monthly statements. Plaintiffs first met Rodney on December 10, 2018, after Birkley had recommended to plaintiffs that they update their trusts and referred them to Rodney. Plaintiffs returned to Rodney's office on January 17, 2019, to sign the updated trusts. The next time they spoke to Rodney was in April 2020.

¶ 15     According to the fact statement, in January 2020, plaintiffs demanded that Matthew return $500,000 of the money they had invested in November 2018. "[Plaintiffs'] demand was prompted by several 'red flags' regarding their relationship with Matthew." Those " 'red flags' " were: (1) "in March 2019, Matthew had made a double-payment of the monthly distribution he made to

[plaintiffs] to cover monthly living expenses"; (2) "in July 2019, Matthew distributed $60,000 to [plaintiffs] to cover a federal quarterly tax liability, when plaintiffs had requested only a $30,000 distribution"; (3) "in August 2019, [plaintiffs] requested another $30,000 distribution to cover the next quarterly tax liability, and Matthew distributed $250,000 to them"; (4) "[plaintiffs] perceived Matthew's bookkeeping as 'terrible and very sloppy,' which was a big 'red flag' to them"; (5) "[plaintiffs] did not receive any monthly statements from Matthew and *** [FWL], after July 2019"; (6) "Midland's December 2019 quarterly statement reflected the same balance on [plaintiffs'] account with Matthew as shown on Midland's September 2019 quarterly statement, right down to the penny"; (7) "Matthew ceased making the aforementioned monthly distributions to [plaintiffs] for their living expenses as of January 2020"; and (8) "[plaintiffs] thus demanded that Matt[hew] return[ ] some of the invested funds to them because they 'knew at that point something was going on.' "

¶ 16    When asked what prompted him to demand a return of $500,000, Richard explained:

> "I was already fairly confident at that point that this was a charade and that this was a scam that we had been vulnerable toward, and I wanted my money back as soon as I could, but I also reasoned that I didn't want to spook Matt[hew] *** by asking for the entire amount, and—and I thought if I could get half of it back, it would be better than nothing, and once I got that back, I would go after the remainder. I wanted him to still think we were partnering with him."

¶ 17    Referencing these admissions in the fact statement, defendants' motion for summary judgment contended that, as a matter of law, the action was time-barred because it was filed more than two years after January 2020, which was when plaintiffs knew or reasonably should have known of their injury and that it was wrongfully caused.

¶ 18    On March 25, 2024, plaintiffs filed (1) a response to the motion for summary judgment, (2) Richard's affidavit, and (3) a counterstatement of material facts. Plaintiffs contended that the trial court should not decide the issue as a matter of law, because (1) it was for the jury to decide when plaintiffs knew or reasonably should have known of their injury and that it was wrongfully caused and (2) there were no undisputed facts that established that plaintiffs knew or reasonably should have known in January 2020 that they had been wrongfully injured. According to plaintiffs, they did not know and could not reasonably have known that Matthew wrongfully injured them until they received the grand jury subpoena on March 19, 2020, and spoke to an FBI agent the next day. In his affidavit, Richard asserted that the " 'red flags' " he identified in his testimony "[did] not demonstrate that [plaintiffs] knew that Matthew or FWL had stolen or misappropriated [their] investment ***." Relying on Richard's affidavit, plaintiffs argued that

"the late monthly distribution, stale or late account statements, and distributions larger than expected or requested did not alert [Richard] that they had been injured[,] let alone wrongfully. These red flags, as [Richard] called them, showed that FWL was sloppy and poorly managed, not an intentional, or even negligent wrongdoer."

¶ 19    On April 15, 2024, defendants filed their reply to plaintiffs' response. They argued that plaintiffs could not use Richard's affidavit to contradict his sworn testimony and that there were no genuine issues of material fact as to whether plaintiffs knew or should have known as of January 2020 that they were wrongfully injured.

¶ 20    A hearing on defendants' motion for summary judgment occurred on May 8, 2024.[1] On May 15, 2024, the trial court filed its "Memorandum Decision and Order," granting defendants' motion. The court agreed with defendants that "[p]laintiffs' conduct and Richard's sworn

---

[1]The record does not contain a report of proceedings for this hearing.

testimony explaining that conduct" established that plaintiffs were aware in January 2020 of Matthew's wrongful conduct. The court stated:

"In January[ ] 2020, two months before receiving a grand jury subpoena, [p]laintiffs requested Matthew return $500,000 of their investment. That request by itself would not necessarily establish that [p]laintiffs knew that Matthew was engaging in wrongful conduct. However, Richard's deposition testimony explaining his state of mind in making that request establishes unequivocally that he knew at that point that Matthew was engaging in wrongful conduct. Richard described Matthew's conduct both as a 'charade' and a 'scam'—there are no innocent explanations for such conduct. The fact that Richard knew that Matthew had defrauded them of their investment by January[ ] 2020 is further cemented by his statements, 'I wanted my money back as soon as I could' and 'I thought if I could get half of it back, it would be better than nothing.' Further, Richard explained that the request for only a portion of their money back in their January[ ] 2020 request was in fact a plan to not spook Matthew and lure Matthew into thinking they were not aware of his fraud ('I wanted him to still think we were partnering with him'). In sum, Richard's sworn testimony explaining the thought process behind their January[ ] 2020 request for return of $500,000 unequivocally establishes that [p]laintiffs knew, not just suspected, that Matthew had stolen their money."

¶ 21 The trial court also rejected plaintiffs' argument, raised for the first time at the hearing, that defendants should be estopped from raising the statute-of-limitations defense. The court noted that it had allowed plaintiffs to submit case law at the hearing and that those authorities "relate[d] to the sued party fraudulently concealing a cause of action or equitable estoppel, the theories being that the sued party induced the suing party to delay suing until the statute of limitations ran." The

court determined that plaintiffs had "pled no *** facts" that would bring their case under that estoppel principle. Nonetheless, the court acknowledged that, "when there is a fiduciary relationship, as is alleged here, a claim for fraudulent concealment may proceed when the attorney 'fails to fulfill his duty to disclose material facts concerning the existence of a cause of action.' " The court found, however, that even if Rodney had a duty to disclose material facts concerning the existence of a cause of action, any fraudulent concealment would not have tolled the statute of limitations because, when plaintiffs discovered the fraudulent concealment (or when they should have discovered it through ordinary diligence), sufficient time remained within the limitations period for them to investigate and bring their lawsuit. The court concluded that, because plaintiffs knew of Matthew's wrongful conduct by January 2020, they had sufficient time (two years) to determine if they had a claim against Rodney and to file suit against him, regardless of whether Rodney told them they had no such claim.

¶ 22    This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    Plaintiffs contend that the trial court erred (1) in determining as a matter of law that plaintiffs knew or should have known more than two years before filing suit that they were wrongfully injured, and (2) in failing to estop plaintiffs from asserting the statute of limitations as a defense.

¶ 25    Summary judgment is proper only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022); *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. A genuine issue of material fact exists "where the material facts are disputed or, if the material facts are undisputed, reasonable persons

might draw different inferences from the undisputed facts." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. "Although summary judgment is a drastic means of disposing of litigation, it is an appropriate measure in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390-91 (1993). We review *de novo* a grant of summary judgment. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 26    Section 13-214.3(b) of the Code provides as follows:

"An action for damages based on tort, contract, or otherwise *** against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within [two] years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2022).

¶ 27    "Section 13-214.3(b) incorporates the discovery rule, 'which delays commencement of the statute of limitations until the plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.' " *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 13 (quoting *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 672 (1997)). "Knowledge that an injury has been wrongfully caused does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." (Emphasis omitted and internal quotation marks omitted.) *Id.* Rather, "[a] person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct had occurred." *Id.*

¶ 28    Thus, the question is whether there is a genuine issue of material fact that plaintiffs had sufficient information, more than two years before filing suit on March 14, 2022, to put a reasonable person on notice that they had suffered an injury and that it was wrongfully caused. See *Shrock v. Ungaretti & Harris Ltd.*, 2019 IL App (1st) 181698, ¶ 52.

¶ 29    Plaintiffs contend that Richard's deposition testimony did not establish a reasonable basis to believe, more than two years before filing suit, that he suffered an actual injury, *i.e.*, a loss of his retirement funds. Plaintiffs argue that Richard's "words 'scam and charade' are not indisputable indicators that Richard *** believed he had been wrongfully injured." Instead, according to plaintiffs, "in January 2020, all [plaintiffs] had were merely suspicions that Matthew was a sloppy bookkeeper." Plaintiffs assert that "the facts are disputed[ ] and the jury should have heard what Richard meant when he testified that he was scammed and part of a charade."

¶ 30    We note that, although plaintiffs claim that "the facts are disputed," there is no factual dispute. Plaintiffs cannot use Richard's affidavit to contradict his testimony (see *Demos v. National Bank of Greece*, 209 Ill. App. 3d 655, 660 (1991)), which is clear and otherwise uncontroverted. Thus, if summary judgment for defendants was inappropriate, it was because "reasonable persons might draw different inferences from the undisputed facts" (see *Mashal*, 2012 IL 112341, ¶ 49)—more specifically, that reasonable persons could find that plaintiffs did not have a reasonable basis to believe before March 14, 2020, that he had suffered financial injury.

¶ 31    We hold no genuine issue of material fact exists that, based on Richard's testimony, plaintiffs knew or reasonably should have known before March 14, 2020, that they had suffered a financial injury and that it was wrongfully caused. When asked "[w]hat prompted [him] in January 2020 to demand a return of $500,000 that [he] had invested with [FWL]," Richard stated:

"I was already fairly confident at that point that this was a *charade* and that this was a *scam* that we had been vulnerable toward, and I wanted my money back as soon as I could, but I also reasoned that I didn't want to spook Matt[hew] *** by asking for the entire amount, and—and I thought if I could get half of it back, it would be better than nothing, and once I got that back, I would go after the remainder. I wanted him to still think we were partnering with him." (Emphasis added.)

¶ 32   Plaintiffs argue that Richard's use of the words "charade" and "scam" does not establish that plaintiffs knew or should have known that they were wrongfully injured. According to plaintiffs, Richard believed that he was scammed and part of a charade only because of "bookkeeping errors," "not because [plaintiffs] had been wrongfully injured." In support, plaintiffs point out that, immediately following the above-quoted testimony, Richard was asked why he was "suspicious by January *** 2020" that he had been scammed. He answered:

"There were a number of things. If you go back to our March of 2019, we ended up with a double payment. His bookkeeping was terrible and very sloppy. We ended up with a double payment on our monthly living expenses.

Then in July, I believe, we ended up with $60,000 in our account versus the [$]30,000 I needed for my quarterly tax payment.

The following month, when I was trying to set up my tax payment for September, they sent me the [$]250,000 by mistake, which I returned [$]220[,000] of it to them, but it became very obvious as we progressed through the year that his bookkeeping was very sloppy, which was a big red flag to me, *and then you couple that with the fact that the last statement I got through [FWL] was in July of 2019.*

The Midland statement in September of 2019 showed a nice increase, as I would have expected, but *that was the last time that any of our funds increased*.

*The December statement from Midland was exactly the same amount as September*. The March of 2020 statement was exactly the same as September of '19.

*You start adding it all together* and you can see why I was very suspicious." (Emphases added.)

¶ 33 Contrary to plaintiffs' argument, the testimony reveals that Richard was concerned with more than just shoddy bookkeeping. To be sure, Richard commented on bookkeeping errors as *one* "red flag." However, Richard "coupled" those errors with the fact that, after July 2019, plaintiff never received another account statement from FWL and that the December 2019 Midland statement reflected the exact same balance as the September 2019 Midland statement. These additional concerns involved more than just "sloppy" accounting. We note further that, in a different portion of his deposition, when asked about his state of mind upon receiving the December 2019 Midland statement and observing that the balance had not changed since September 2019, Richard stated:

"I knew something was going on, *plus the fact that we were getting monthly distributions to live on from [Matthew] *** and that stopped as of January of 2020*, and so I asked [Birkley] to have Matt[hew] return half of the money that we gave him, thinking that it might be—*it would be better to get half of it back* than the entire amount, because I—I knew at that point something was going on, and I had given him a deadline. *That deadline came and went*. And then in approximately March, *** I sent a letter to [Birkley] telling him that I wanted my entire amount back. *I had received nothing from the [$]500,000 that I had asked him to return, and I asked [Birkley] to intervene ****.*" (Emphases added.)

¶ 34 Taking Richard's testimony in its entirety, there is no genuine issue of material fact that plaintiffs had enough information before March 14, 2020, to place reasonable persons on notice that they had been wrongfully injured. Richard related that he had been "vulnerable" to a "scam," noting that he had not received statements from FWL since July 2019, had not received expected monthly distributions as of January 2020, and had not received the money back that he requested. Accordingly, we hold as a matter of law that, before March 14, 2020, plaintiffs knew or reasonably should have known of their wrongful injury.

¶ 35 Plaintiffs next contend that defendants should be estopped from asserting the statute of limitations as a defense.

¶ 36 We note that plaintiffs raise a common-law equitable estoppel claim rather than a statutory one. See 735 ILCS 5/13-215 (West 2022) ("If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards."). To invoke equitable estoppel, the party claiming estoppel must demonstrate the following:

"(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when that party decided to act, or not, upon the representations; (4) the other person intended or reasonably expected that the party claiming estoppel would determine whether to act, or not, based upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel

would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 82-83 (2006). Regardless, the principles behind the two doctrines are substantively the same. *Turner v. Nama*, 294 Ill. App. 3d 19, 26 (1997). For either equitable estoppel or fraudulent concealment to apply, "a party must generally show that the defendant said or did something to lull or induce [the] plaintiff to delay the filing of his claim until after the limitations period has run." (Internal quotation marks omitted.) *Carlson v. Michael Best & Friedrich LLP*, 2021 IL App (1st) 191961, ¶ 56.

¶ 37     Plaintiffs argue that defendants should be estopped from asserting a statute-of-limitations defense due to Rodney's actions (or lack thereof) during his December 10, 2018, meeting with plaintiffs. They reason that Rodney engaged in fraudulent concealment during that meeting by failing to disclose that Matthew was under investigation for securities fraud and that plaintiffs had a claim for rescission against Matthew under the ISL. Plaintiffs argue: "These facts met the requirements of fraudulent concealment (and equitable estoppel) because the statute of limitations for a rescission claim under the ISL had run[.]" We clarify however that, contrary to plaintiffs' framing of the issue in their brief, the issue is not whether defendants concealed a cause of action against Matthew for rescission (and delayed the filing of *that* claim) but, rather, whether defendants concealed the present cause of action against *defendants* (and delayed the filing of the *present* claim).

¶ 38     Defendants argue in response that estoppel does not apply, because (1) plaintiffs presented no evidence of an affirmative statement by Rodney that would have dissuaded them from recognizing that they had a cause of action against anyone, (2) the factual bases of the cause of action and the estoppel claim are the same, and (3) at the time plaintiffs discovered their injury, a

reasonable time remained in the limitations period. We agree with defendants' latter two arguments.

¶ 39    Initially, we note that, contrary to defendants' argument, a defendant's silence may form the basis of an estoppel claim when, as in the present case, "a fiduciary, trust, or other confidential relationship exists between the plaintiff and the defendant ***." *Doe No. 2 v. Boy Scouts of America*, 2016 IL App (1st) 152406, ¶ 82. In particular, "a fiduciary who is silent, and thus fails to fulfill his duty to disclose material facts concerning the existence of a cause of action, has fraudulently concealed that action, even without affirmative acts or representations." (Emphasis omitted.) *DeLuna*, 223 Ill. 2d at 82-83. Accordingly, the absence of an affirmative statement by Rodney is not dispositive.

¶ 40    In any event, we agree with defendants that estoppel does not apply, because (1) the estoppel claim is based on the same conduct as plaintiff's cause of action and (2) the conduct underlying the estoppel claim did not prejudicially impact the filing of plaintiffs' action. It is well established that "the allegedly fraudulent statements or omissions that form the basis of the cause of action may not constitute the fraudulent concealment in the absence of a showing that they tend to conceal the cause of action." *Barratt v. Goldberg*, 296 Ill. App. 3d 252, 257 (1998); see also *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 38 ("[I]t is well-established that the basis of a legal malpractice action also cannot constitute the grounds for equitable estoppel; there must be some misrepresentation by the defendant that the plaintiff relied on to his or her detriment to prevent the filing of a legal malpractice action.").

¶ 41    At oral argument, plaintiffs' counsel asserted that the cause of action against Rodney was "for failing to live up to the standard of care for Illinois lawyers who are fiduciaries who are required to disclose certain information for the benefit of their clients." He asserted further that the

cause of action "has nothing to do with Matthew." However, the allegations in the second amended complaint show otherwise. The factual basis of plaintiffs' cause of action for breach of fiduciary duties arising out of an act or omission in the performance of professional services was Rodney's failure to disclose to plaintiffs certain information about Matthew, including that plaintiffs had a claim for rescission against Matthew under the ISL. The factual basis of plaintiffs' equitable estoppel claim is, likewise, that Rodney failed to disclose to plaintiffs that they had a rescission claim against Matthew under the ISL.

¶ 42    Moreover, even assuming that Rodney, by his silence at the December 10, 2018, meeting, fraudulently concealed the present cause of action, plaintiffs did not rely on that concealment to their detriment, because they still had a reasonable period of time to bring the present cause of action upon discovering it. Indeed, they had the entire two-year limitations period. "The doctrine of equitable estoppel will not apply to a case if the defendant's conduct terminated within ample time to allow the plaintiff the opportunity to file a cause of action within the limitation period." *Barratt*, 296 Ill. App. 3d at 259; see also *Anderson v. Wagner*, 79 Ill. 2d 295, 322 (1979) (limitations period not tolled "[i]f at the time the plaintiff discovers the 'fraudulent concealment' a reasonable time remains within the applicable statute of limitations"); *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 866 (finding six months sufficient time to file).

¶ 43    Here, as counsel conceded at oral argument, plaintiffs' cause of action against defendants did not accrue until they knew or reasonably should have known of the wrongful injury that formed the basis of their claim. As we determined above, this happened in January 2020. At that time, plaintiffs had two years to file this action. Defendants' alleged act, in *December 2018*, of fraudulently concealing the cause of action had no effect at all on the limitations period. Nor was

there evidence that, after the cause of action accrued, defendants did anything to conceal it. Thus, the doctrine of equitable estoppel does not apply.

¶ 44                                III. CONCLUSION

¶ 45    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 46    Affirmed.